[Civil No. 662.  Filed March 15, 1899.]

[56 Pac. 871.]

# TERESA JORDA DE HEREU, Plaintiff and Appellant, v. NARCISSO HEREU, Defendant and Appellee.

1. MARRIAGE AND DIVORCE — DECREE — VALIDITY — LACK OF PROOF OF SERVICE—APPEARANCE.—This court will not inquire into the validity of a decree of divorce at the suit of the defendant therein attacked on the ground that there was no proof of service as required by statute, where it appears that subsequent to its entry defendant appeared and consented to the entry of an amended decree on condition that it provide that she have a portion of the community property.

2. SAME—SAME—SAME—OPENING UP—COMP. LAWS ARIZ. 1877, PAR. 2504, CONSTRUED.—Under paragraph 2504, *supra,* providing that in all cases where no personal service was had the court may at any time within two years allow the defendant to appear and answer, it is within the power of the court to allow the defendant in a divorce suit to file her answer and to ask to have the judgment corrected so that her rights may be protected.

3. SAME—ACTION FOR DIVORCE—DEFENSE—PRINCIPAL AND AGENT—RATIFICATION OF ACTS—NECESSITY FOR WRITTEN AUTHORITY.—Where a defendant in a suit for divorce appoints an agent with full power to conduct her defense, and is fully aware of every step he takes, and ratifies the same, she is bound by his acts, and the fact that such agent has no written power of attorney is immaterial.

4. SAME—SAME—DECREE—COLLUSION AS TO FACTS—MAY CONSENT AS TO NATURE AND FORM OF DECREE.—While courts will not render decrees of divorce where there is collusion as to the facts, parties in court may consent to the character and nature of the decree.

5. SAME—SAME—SAME—CONSENT TO ENTRY OF AMENDED DECREE.— Where in an action for divorce, service being had by publication, after the hearing of evidence, a decree of divorce is entered, and subsequently thereto the defendant appears and without seeking to have it set aside consents to the entry of an amended decree providing for the payment to her of half of the community property, such amended decree is not a consent decree of divorce, but is a confirmation of the first decree.

6. SAME—SAME—SAME—VACATING—EQUITY—RELIEF AGAINST MISTAKE OF LAW.—When defendant in a divorce suit, with full knowledge of all the facts and circumstances, consents to the entry of a decree of divorce which provides that she shall have one half of the community property, she will not be permitted to maintain an action to set aside the decree on the ground that she was advised

by her counsel that such decree was binding upon her, and that she is now advised otherwise, such mistake being one of law alone.

7. EQUITY—RELIEF AGAINST MISTAKES OF LAW—COMPROMISES.—Equity often relieves against mistakes of law, but under such circumstances that the mistake may be treated as one of fact. But where one, with full knowledge of the material facts, compromises her claims against another and obtains a decree which accomplishes the ends she wishes to effect, she will not be heard to complain that she was mistaken as to the legal effect thereof as to its binding force.

8. SAME—DEFENSES—DELAY.—Delay in pursuing a remedy is not acquiescence; yet mere delay may of itself be a reason for courts of equity to refuse to act, and they generally do refuse where other parties have contracted new engagements as the result of delay.

9. SAME—SAME—ACQUIESCENCE DEFINED.—Acquiescence is mere silence—refusal to speak when one ought to speak for the protection of others, or to act in time to prevent others from doing acts of which the dilatory one afterwards complains.

10. SAME—SAME—CONFIRMATION DEFINED.—Confirmation is a deliberate act—a ratification of a previous transaction known to be avoidable.

11. SAME—SAME—LACHES—ACQUIESCENCE—CONFIRMATION — MARRIAGE AND DIVORCE—VACATING DECREE.—Where defendant consented to the modification of a voidable decree of divorce by which she received one half of the community property, she is estopped by confirmation, also by acquiescence and laches in delaying fifteen years to have the judgment set aside, until in the mean time plaintiff had remarried and a new family had grown up under his protection.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Pima. George R. Davis, Judge. Affirmed.

The facts are stated in the opinion.

C. W. Wright, for Appellant.

Z. A. Zabriskie, Lovell & Satterwhite, and Barnes & Martin, for Appellee.

Plaintiff cannot successfully attack this decree for defects in service of publication, where such defects were known and acquiesced in for fifteen years. *Badger* v. *Badger*, 2 Wall. 94; *Sullivan* v. *Railway Co.*, 94 U. S. 807; Pomeroy's Equity Jurisprudence, pars. 418, 419.

Laches deprives a plaintiff of the right to appeal to a court of equity, and the court may refuse to entertain a suit brought after unreasonable delay, although defendant has not in his answer alleged that the claim is stale. *Harris* v. *Hillegass,* 66 Cal. 79, 4 Pac. 966.

STREET, C. J.—1. Appellant and appellee were married in the city of Gerona, Spain, on the twenty-ninth day of October, 1856. Soon thereafter they came to America, and lived a short while in New Orleans, and subsequently in Matamoras, Mexico. Appellant was the wife, and appellee the husband, the full name of whom was Narcisso Hereu de Matas, Matas being the name of his mother. Appellant and appellee lived together, not harmoniously, until about the year 1879, when the wife, appellant herein, returned to New Orleans, and occupied the property which belonged to the community, the title to which was in the name of the husband, Narcisso Hereu de Matas. The issue of the marriage was two children —Rudolph de Matas and Elvira de Matas. In 1880 Narcisso, the father and husband, went to New Orleans to receive medical treatment at a hospital; and, as he was recovering, the son, Rudolph, then about twenty years of age, induced him to go to the house where his mother and sister were living. When the father reached the house, an angry dispute arose, as of old, between the husband and wife. The wife approached him in a conciliatory manner, whereupon he declared that "he had come solely to see the children, and that he was no more a husband to her, nor did he intend to be in the future." An exciting scene followed, which ended in the mother going to her room, and the father remaining in the room of his son. After staying at the house a few days, he left. Appellee went to Tucson, Arizona, and took up his permanent residence there; the wife remaining in New Orleans in the property to which she moved when she left Matamoras. On the twenty-ninth day of November, 1881, the husband, under the name of Narcisso Hereu, filed his complaint in the district court of Pima County against the wife, Teresa Jorda de Hereu, asking for a decree in divorce, and alleging as a cause that "on or about March 13, 1879, the said defendant, disregarding the solemnity of her marriage vow, at Matamoras, republic of Mexico, where plaintiff and defendant then resided, willfully and without

cause disregarded and abandoned the plaintiff, and ever since
has and still continues so to, willfully and without cause, dis-
regard and abandon said plaintiff, and to live separate and
apart from him, without any sufficient cause, or any reason,
and against his wish," etc. The defendant in that cause being
out of the territory and a non-resident, service of summons
was had, or attempted to be had, by publication. Under para-
graph 2466 of the Compiled Laws of 1877, the probate judge
of Pima County made an order for the publication of the sum-
mons in the Daily Journal, a newspaper published in Tucson,
and further ordered that a copy of the summons and complaint
be deposited in the post-office, postpaid, and directed to the
defendant at her place of residence in New Orleans, state of
Louisiana. The summons was published under said order for
fifty-two consecutive days (from the first day of December,
1881, to the twenty-first day of January, 1882, both inclusive)
in the Daily Arizona Journal, a newspaper published in
Tucson, and for eight successive days (from the twenty-third
day of January, 1882, to the thirty-first day of January, 1882,
both inclusive) in the Arizona Citizen, likewise a newspaper
published in Tucson; and a copy of the summons and com-
plaint was mailed to the defendant therein, by B. H. Hereford,
attorney for plaintiff, by depositing it in the post-office at
Tucson, postpaid, and directed to the defendant in New Or-
leans, without any special directions as to residence in said
city, so far as shown by the record. Paragraph 2467 provides
that the order shall direct the publication to be made in some
newspaper, to be designated, as most likely to give notice to
the person to be served, the last of which insertions shall be
sixty days from the first. The defendant made no answer or
appearance, and on the third day of April, 1882, the district
court of Pima County, at a regular term thereof, entered a
decree of divorce, dissolving the marriage between plaintiff
and defendant in said action, and releasing them from the
bonds of matrimony, in which decree the court recited that
it was done upon the proofs taken in said action, and upon
the report of the court commissioner and referee in the cause
appointed to take proofs of the facts set forth in the com-
plaint. Thereafter, on the eighteenth day of March, 1883,
the divorced husband, Narcisso, married another wife, who is
still alive; the issue of said marriage being one daughter,

now eleven or twelve years of age. Upon the fact of that marriage coming to the knowledge of the divorced wife, then still living in New Orleans, she had a conference with her brother, her son, Rudolph, and a nephew, about the recovery of her share in the community property. It is claimed that until the wife heard of the remarriage of the husband she had no knowledge of any divorce proceedings, but then a copy of the decree of divorce was obtained by her nephew, Judge Emilio Forto, and it was translated to her by her son, Rudolph, and her brother, Thomas Forto. The result of the conference was that the son, Rudolph, accompanied by her nephew, went to Tucson, with directions from the wife to enter proceedings against the husband, and to set the decree of divorce aside, unless the son could get a favorable settlement with the father in the interest of the mother for her share of the community property. The son and nephew arrived in Tucson in May, 1883, and at once employed counsel, whom the mother had directed the son to employ, to take such steps as would secure to the mother her property rights. The counsel so employed had a conference with the husband, and afterwards with the husband's counsel, so that, under the direction of the counsel employed by the son, the mother sent a power of attorney to the son, under date of the 31st of May, 1883, which in effect was a power to settle and satisfy any claims existing in the wife's favor against the husband, and, if necessary, to sue upon the same, and to appear to prosecute and defend any actions in law or in equity which in his judgment might seem proper to litigate her claims to a final settlement or compromise, and to employ counsel for that purpose. The appellant says she never signed that power of attorney. Afterwards, on June 23, 1883, the attorneys employed made appearance in the district court in the original case of Narcisso Hereu against Teresa Jorda de Hereu, and stated that they appeared upon the retainer of Rudolph, the attorney in fact for the defendant, and filed their petition for the defendant, setting up the fact of the decree of divorce on the 3d of April, 1882, making allegations that the defendant was ignorant of the pendency of the action; that she had not received a copy of the summons or complaint, and made allegation of the existence of community property, and tendered an amended judgment, to be entered *nunc pro tunc* as of the third day of

April, 1882. The petition was sworn to by the son, Rudolph Matas, and upon the same day the plaintiff in that action, Narcisso Hereu, in person and by his attorneys, filed a paper indorsed "Stipulation and Consent of Plaintiff," wherein he confessed and admitted all of the facts in the petition, and consented to the filing of said amended judgment and decree as asked for, all of which was the result of the negotiations carried on by the son. Whereupon an amended judgment was entered, reciting the fact of the action being commenced on the twenty-ninth day of November, 1881, the affidavit for publication of summons, the issuance of the summons, the publication of the summons, and proofs of its publication, the judgment of the court on the hearing of the cause, the existence of the community property in the sum of ten thousand dollars, and again decreeing as follows: "Now, therefore, it is ordered, adjudged, and decreed that the bonds of matrimony heretofore existing between plaintiff and defendant be, and the same are hereby, absolutely dissolved and set aside, and said plaintiff, Narcisso Hereu, and the defendant, Teresa Jorda de Hereu, are hereby divorced; and it is further ordered, adjudged, and decreed that the said plaintiff, Narcisso Hereu, do pay to the said defendant, Teresa Jorda de Hereu, the sum of five thousand dollars, in full of her share of the community property, and for her separate property; that this judgment and decree be filed and entered *nunc pro tunc* as of the 3d day of April, 1882." Under this decree the husband paid to the son, for the mother, the sum of three thousand dollars in cash, and delivered to him two notes of the denomination of one thousand dollars each; and also, as a result of the negotiations, the husband made, executed, and delivered unto the wife a deed for all of the New Orleans property occupied by her then as a residence, and transferred to her mining stock in the Mammoth Mining Company of Arizona. The son returned home to New Orleans and reported the facts to the mother. Soon thereafter Teresa Jorda de Hereu sold the property which the husband had so deeded to her, and went to Spain, where she remained until 1895, when she returned to New Orleans. In 1897 she came to Tucson, with the avowed purpose of collecting the two promissory notes given by her husband in settlement of the judgment. When she reached there, she was advised that the

proceedings in divorce were a nullity, and thereupon filed a complaint in the district court reciting the history of the two judgments in divorce, in which she alleged: That on the return of her son, Rudolph, to New Orleans, she was apprised that a final decree in divorce had been entered; that Rudolph informed her that such decree was in all things valid and binding; that he had submitted the same to eminent and learned counsel, each of whom had carefully examined the record in said cause, and that each had assured him that the said decree was valid, binding, and final; and that she would be compelled to abide by it; that she, in all things, believed in and relied on the statements so made to her, and because thereof had left the United States and taken up her residence in Spain; and that after her arrival in Pima County, in 1897, she learned for the first time that said decrees of divorcement, and both of them, were each wholly and utterly void. Her complaint was fully answered by appellee, who set up the proceedings in the two decrees, and prayed that they in this action be decreed valid and binding.

2. The question whether the first decree was valid or not may remain unanswered. It is attacked solely upon the ground that there had been no proof of service, such as contemplated by statute. It is not charged that there was any fraud upon the court, nor that the plaintiff was not a citizen and *bona fide* resident of the territory for the proper time; nor is it charged that the facts in the complaint are untrue, but solely that the defendant did not have actual knowledge of the institution of the suit and the pendency of the action asking for a divorce, and that there had not been the technical statutory publication of the summons. Paragraph 2641 of the Compiled Laws of Arizona, then in force, directs: "Immediately after entering the judgment, the clerk shall attach together and file the following papers which shall constitute the judgment-roll: In case the complaint be not answered by the defendant, the summons, with the affidavit of proof of service and the complaint, with a memorandum indorsed on the complaint that the default of the defendant in not answering was entered, and a copy of the judgment." The transcript of the evidence taken in the present case sets out as exhibits all such matters, but we are unable to determine whether they were embodied in the judgment-roll in the original case. The judgment of

the court, however, recites that the default of the defendant was legally entered, and that the referee had taken the testimony by question and answer, and made report of the same to the court, from which it appeared all the material averments of the complaint are sustained by the testimony, free from legal exceptions. It appears from the transcript in this case that the proof of publication of summons showed that it was published in one paper for fifty-two days, and in another paper, not mentioned in the order of the probate judge, for eight days; and it also appears that the summons and a copy of the complaint were mailed to the then defendant in New Orleans, as the statute prescribes. We will accept as a fact that she knew nothing of the proceedings or decree of divorce until she heard of her husband's marriage, nearly a year afterwards. When shown the decree of divorce, she took counsel with her brother, her nephew, and her son, and with a lawyer in New Orleans, as to the feasibility of attacking the judgment and setting it aside, not upon the ground that a fraud had been perpetrated upon the court, or that the facts set forth in the complaint were not true, but upon the ground that there had been no legal service of summons upon her. The question, however, which affected her was one of property, and the evidence is so strong that it makes it convincing that the question of property was uppermost in her mind. It is also convincing that the result of the conferences between her and her relatives and the lawyer in New Orleans was, that if she could get a proper settlement of the property and get her share of the community estate, the judgment in divorce need not be attacked, but that they would attack the judgment if it became necessary to enforce a compromise about the property; and it was with this view that she sent her son, who had then reached the years of majority, as her agent, to Tucson, with full power to do the best he could in getting her share of the community property, and to attack the judgment if it were necessary in effecting a compromise.

3. This brings us to the question of the second decree, which is attacked by her as having been rendered without her authority, and as appearing upon its face a consent judgment in divorce. It has also been attacked because it was opening up a judgment, not at the term at which it was rendered, but after the term had closed and other terms had intervened.

It is a general rule of law that all the judgments, decrees, and other orders of the courts, however conclusive in their character, are under the control of the court which pronounces them, during the term at which they are rendered or of record, and they may be set aside, vacated, modified, or annulled by the court; and it is a rule, equally well established, that after the term is ended all final judgments and decrees of the court pass beyond its control, unless steps be taken during that term, by motion or otherwise, to set aside, modify, or correct them. During a term of the court the judgment is in the breast of the judge. After the term has expired it is committed to the rolls. That rule, however, has some modifications, and especially in divorce proceedings it has not been strictly followed. It was the doctrine and rule of the ecclesiastical courts of England that a sentence or judgment against the validity of a marriage, either annulling a voidable marriage, or declaring that a pretended marriage was absolutely void, was not final, but was forever open to revision and reversal. Paragraph 2504 of the Compiled Laws of Arizona, then in force, prescribes: ''When from any cause the summons and a copy of the complaint in an action have not been personally served on the defendant, the court may allow, on such terms as may be just, such defendant, or his legal representative, at any time within two years after the rendition of any judgment in such action, to appear and answer to the merits of the original action.'' Black, in his work on Judgments, says: ''There are cases holding that such statutes do not include decrees of divorce.'' But he says: ''Unless such decrees are specifically withdrawn from the general class, it is difficult to see how they can be considered as exceptions to the terms of a statute plainly extending to all judgments, on any right principles of interpretation.'' 1 Black on Judgments, sec. 320. The case of *Edson* v. *Edson,* 108 Mass. 590, is a case in point. That was upon a petition asking that a judgment and decree in divorce rendered at a former term be set aside on the ground of fraud. In discussing the question the court say: ''We believe it to be an established principle of jurisprudence that courts of justice have power, on due proceedings had, to set aside or vacate their judgments and decrees, when it appears that an innocent party without notice has been aggrieved by a judgment or decree obtained against

him, without his knowledge, by fraud of the other party. . . .
It is a petition, addressed to the sound judicial discretion
of the court, asking that a decree rendered at a former term
may be reopened and vacated on the ground that it was fraud-
ulently obtained. It is in the nature of an application to
correct the record and prevent a wrong and injustice from
the effect of the judgment as it now stands.'' Under the
statute quoted it was within the power of the district court
to allow the defendant in that action to come into court and
be permitted to file her petition in the nature of an answer,
and ask to have the judgment corrected so that her rights
which she set up should be protected.

The defendant insists that she never signed the power of
attorney to her son. Whether she did or not makes but little
difference; for she clothed him fully with the power which
he exercised, by oral directions, and she was fully aware of
every step that he was about to take, and after the matter
was concluded she was fully informed of everything that
had been done, and she expressed her satisfaction with it.

It may be conceded that decrees of divorce cannot be ren-
dered by agreement or by collusion, but only upon regular
process, or by appearance to the jurisdiction, and upon proof
taken. Courts will not enter decrees of divorce where there
is a collusion as to the facts, but where the parties are in
court they may consent as to the character and nature of
a decree. A decree of court was already on record between
these parties, and she asked to come into court to attack it
in one particular only, and that was to obtain her share of
the community property. She knew all of the circumstances
of the decree, such as it was, and could have asked to have
had it set aside, had she so chosen; and that question, as we
have heretofore said, was repeatedly discussed by her and
her relatives, her son, and attorney, in New Orleans, and dis-
cussed by her son and the lawyers he employed by her request
at Tucson. There was no effort made at that time to set the
decree aside, but an effort was made to have it corrected, so as
to protect her in the only rights she complained of losing;
and for that purpose she filed her petition and tendered an
amended judgment. She based her right to have the judgment
amended upon the fact that it had been obtained without her
knowledge, and it was within the power of her attorneys

employed in the case and attorney in fact, or agent, to consent either that the first decree should stand, or to consent that a decree might then be entered as a ratification of the decree already entered, upon the consideration that she should have a division of the community property. She could not have obtained a judgment for any portion of the community property without the establishment of such a decree. We think it cannot be said that the decree then entered, divorcing plaintiff and defendant, was a consent decree. It was agreed that the decree already in existence should be ratified, and for that purpose a new decree was drafted, having relation to the time when the former decree was entered. Upon the basis of such decree she obtained three thousand dollars cash, two thousand dollars in promissory notes, and, by an agreement accompanying the decree, obtained a deed for the New Orleans property, all of which she received and enjoyed; and, whether the first decree was valid or not, the second was a confirmation of it, and the full establishment of such a decree in divorce as the court had jurisdiction to render.

4. We have been asked by appellant to decide only as to the validity of the first and second decrees; but by appellee, to decide—First, that the misapprehension of appellant as to her rights was a mistake of law, and not of fact; second, that appellant is guilty of such gross laches that a court of equity ought not to grant her relief; and, third, that she was fully aware of the facts, and acquiesced in them, so as to be estopped from denying their binding effect upon her. A mistake is an internal mental condition,—an erroneous conception and conviction which influences the will. It is based on ignorance, and courts of equity indulge in relief against its consequences. There are mistakes of law and mistakes of fact. A mistake of law is an ignorance or error with respect to some general rules applicable to all persons, and is also ignorance or error of the person with respect to his own legal rights and interests. The general rule is, that a mistake of law, pure and simple, is not adequate ground for relief. Where a party, with knowledge of all the material facts, enters into a transaction with an erroneous idea of the rules of law controlling the case, courts of equity will not grant relief. Courts of equity have looked with more leniency upon mistakes of fact, and, where a party is misled as to the existence of a fact, if

the mistake arise without his neglect, courts of equity will grant relief. How stands the situation with reference to appellant's complaint in this action to set aside the decrees which were rendered by the district court in Pima County in 1882 and 1883, and have the divorce declared a nullity? Abundant evidence shows conclusively that during the negotiations by her son in Tucson, and after his return to New Orleans, she was fully advised of every step. She says in her complaint that the whole matter was explained to her, that every step had been submitted to eminent counsel, and that she had been advised that the legal effect of all of those steps was to make a decree which was binding upon her. That declaration carries with it a knowledge of the filing of the complaint in November, 1881; of the attempted publication of the summons; of the mailing of the summons and complaint to her. It also involves a knowledge of her petition, through her attorneys, or her agent in fact, her son, in June, 1883, and its contents, setting out the former decree, setting out the fact that it had been obtained without her knowledge, and that there was community property, and the prayer to have the decree reformed in order to get her share of the community property; also, the answer to that petition by her former husband, consenting to the same, the rewriting of the decree to take effect at the time that the first decree was rendered, the payment of the money by the husband to her agent, the delivery of the deed for the New Orleans property, and the delivery of the two notes for one thousand dollars each, all based upon the entry of the decree in divorce. All of these facts she knew, and was satisfied with the settlement, expressing her satisfaction at the results. She knew the fact that it was the judgment of the lawyers whom her son had consulted in New Orleans that all of these facts worked a binding decree upon her; and the mistake she complains of is the mistake in their judgment, which she relied upon,—a mistake as to the legal effect of these facts, corrected in no other way than by the judgment of other lawyers fifteen years afterwards. We have no hesitancy in saying that her complaint and evidence show that she had a full knowledge of the facts; and if a mistake existed at all, it existed as to her conviction, founded upon the judgment of those who told her of the legal effects.

5. Equity may, and often does, relieve against mistakes of

law, but under such circumstances that the mistake may be treated as a mistake of fact. "Whenever a person is ignorant or mistaken with respect to his own antecedent and existing private legal rights, interests, estates, duties, liabilities, or other relations, either of property or of contract, or personal *status*, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands, for the purpose of effecting such assumed rights, interests, or relations, or of carrying out such assumed duties or liabilities, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to, if not identical with, a mistake of fact." 2 Pomeroy's Equity Jurisprudence, sec. 849. But the same author, in the same section, continues: "It should be carefully observed that this rule has no application to cases of compromise, where doubts have arisen as to the rights of parties, and they have intentionally entered into an arrangement for the purpose of compromising and settling those doubts." In the next section (850) the author says: "Compromises, where doubts with respect to individual rights, especially among members of the same family, have arisen, and where all of the parties, instead of ascertaining and enforcing their mutual rights and obligations, which are yet undetermined and uncertain, intentionally put an end to all controversy by a voluntary transaction in the way of a compromise, are highly favored by courts of equity." We have seen that the second decree was a settlement, compromise, and confirmation of the first; and appellant should not be heard to complain that she was mistaken as to the legal effect thereof, as to its binding force, when she was aware of every step that was taken to bring it about, and where the purpose of it was to accomplish ends which she wished to obtain.

6. The other two questions,—viz., "that appellant is guilty of such gross laches that a court of equity ought not to grant relief, and that she was fully aware of the facts, and acquiesced in them, so as to be estopped from denying their binding effect upon her,"—can be considered together as both being in the nature of *quasi* estoppels. Delay in pursuing a remedy is not acquiescence, although it often is strong evidence of acquiescence; yet mere delay—a suffering of time to elapse— may of itself be a reason for courts of equity to refuse to act, and they generally do refuse where other parties have con-

tracted new engagements as the result of delay. Acquiescence is mere silence,—a refusal to speak when one ought to speak for the protection of others, or to act in time to prevent others from doing acts of which the dilatory one afterwards complains. Confirmation is different from either. It is a deliberate act,—a ratification of a previous transaction known to be voidable. Illegal contracts cannot be made good by confirmation, but voidable contracts can be ratified. "If a party originally possessing the remedial right has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfections and of his own rights, or ought, and might with reasonable diligence, have become so aware, and all undue influence is wholly removed, so that he can give a perfectly free covenant, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial remedy, defensive or affirmative, is destroyed." 2 Pomeroy's Equity Jurisprudence, sec. 964. Is not the appellant estopped by confirmation, as well as by acquiescence and laches? She received the award of the judgment, giving her half of the community property, and in addition thereto, as a part of the compromise between herself and appellee, attending the judgment, she received title to all the New Orleans property, and enjoyed the use and possession of that until she sold it for her own individual and separate use and benefit. She is estopped by confirmation and also by acquiescence and laches in delaying to have a judgment of record set aside until a new family had grown up under its protection. The judgment of the district court is affirmed.

Sloan, J., and Doan, J., concur.